UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re PARMALAT SECURITIES LITIGATION

MASTER DOCKET

This document relates to: 06 Civ. 0383, 06 Civ. 3109

04 MD 1653 (LAK)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**OPINION**

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/8/2007

Appearances:

Leo R. Beus
Adam C. Anderson
BEUS GILBERT PLLC
Herbert P. Minkel, Jr., Esq.
*Attorneys for Plaintiffs*

Daniel F. Kolb
Sharon Katz
DAVIS POLK & WARDWELL
*Attorneys for Defendants Deloitte & Touche
USA LLP and Deloitte & Touche LLP*

Richard A. Martin
E. Joshua Rosenkranz
Erik S. Groothuis
Mark A. Picard
HELLER EHRMAN LLP
*Attorneys for Defendant Deloitte & Touche
S.p.A.*

Michael J. Dell
Michael S. Oberman
Timothy P. Harkness
KRAMER LEVIN NAFTALIS & FRANKEL LLP
*Attorneys for Defendant Deloitte Touche
Tohmatsu*

Bruce R. Braun
Linda T. Coberly
WINSTON & STRAWN LLP
Margaret Maxwell Zagel
Ronald P. Gould
GRANT THORNTON LLP
*Attorneys for Defendant Grant Thornton
LLP*

James L. Bernard
Katherine I. Puzone
Michele S. Carino
Marisa Brahms
STROOCK & STROOCK & LAVAN LLP
*Attorneys for Defendant Grant Thornton
International*

A. Robert Pietrzak
Thomas McC. Souther
Daniel A. McLaughlin
Joseph B. Tompkins, Jr.
Alan C. Geolot
Mark P. Guerrera
SIDLEY AUSTIN LLP
*Attorneys for Defendants Bank of America
Corp., Bank of America, N.A., Bank of
America National Trust & Savings
Association, Banc of America Securities
LLC, Banc of America Securities Ltd., and
Bank of America International Ltd.*

Michael S. Feldberg
Todd S. Fishman
Lanier Saperstein
Laura Martin
ALLEN & OVERY LLP
*Attorneys for Defendants Credit Suisse,*
*Credit Suisse International, and Credit*
*Suisse Securities (Europe) Ltd.*

Dennis E. Glazer
Nancy B. Ludmerer
Elliot Moskowitz
Antoinette G. Ellison
DAVIS POLK & WARDWELL
*Attorneys for Defendant Banca Nazionale*
*del Lavoro S.p.A*

Michael C. Lambert
Richard A. Bertocci
Andreas Seuffert
GILMARTIN, POSTER & SHAFTO LLP
*Attorneys for Defendant Banca Intesa S.p.A*

LEWIS A. KAPLAN, *District Judge.*

International dairy conglomerate Parmalat S.p.A. and its affiliates ("Parmalat") collapsed in scandal and filed for bankruptcy in Italy in late 2003. These actions are brought on behalf of the successors of two bankrupt Parmalat subsidiaries against a number of banks and accounting firms principally for helping conceal Parmalat's true financial condition, thus causing the subsidiaries to incur debt in reliance on misrepresentations of Parmalat's financial health. Before the Court are defendants' motions to dismiss the second amended complaints in both actions.

### Facts

The complaints in these two actions are substantially the same. The only relevant differences are that the complaint in *Smith v. Bank of America*[1] names Banca Intesa as a defendant and asserts a cause of action against certain other defendants for aiding and abetting a fraudulent conveyance, while the complaint in *Pappas v. Bank of America*[2] does not. Accordingly, the following allegations are drawn from both complaints unless otherwise indicated.

### I.     *The Parties*

#### A.     *Plaintiffs*

Parmalat USA Corp. ("Parmalat USA") was a wholly owned subsidiary of Parmalat. It had no operations or employees of its own, but was the sole owner of Farmland Dairies LLC ("Farmland"), which was in the business of processing, selling, and distributing dairy products in

---

[1]

06 Civ. 0383.

[2]

06 Civ. 3109.

the United States.[3] According to the complaints, both Parmalat USA and Farmland (the "Companies") were insolvent and completely financially dependent on Parmalat.[4]

The Companies filed for bankruptcy in this district on February 24, 2004, following Parmalat's collapse.[5] On March 10, 2004, the bankruptcy court confirmed a liquidation plan for Parmalat USA and a modified reorganization plan for Farmland. Plaintiff G. Peter Pappas was appointed the administrator of Parmalat USA's Plan of Liquidation. Plaintiff Gerald K. Smith was appointed the litigation trustee of Farmland Dairies LLC Litigation Trust.[6]

*B.     Defendants*

*1.     The Deloitte Defendants*

Deloitte Touche Tohmatsu ("DTT") is a Swiss association headquartered in New York and the umbrella firm for the international accounting enterprise commonly known as "Deloitte."[7]

---

3

> *Pappas v. Bank of Am. Corp.*, 06 Civ. 3109, docket item 6 (second amended complaint), ¶¶ 1-2 [hereinafter, *Pappas* SAC]; *Smith v. Bank of Am. Corp.*, 06 Civ. 0383, docket item 157 (second amended complaint), ¶¶ 1-2 [hereinafter, *Smith* SAC].
>
> For purposes of this Opinion, the Court will cite to "*Pappas* SAC" where the complaints are duplicative, as parallel citations would be cumbersome. It cites to "*Smith* SAC" when referencing allegations found only in that complaint.

4

> *See Pappas* SAC ¶¶ 102-108.

5

> *Id.* ¶ 3.

6

> *Id.* ¶ 11; *Smith* SAC ¶ 11.

7

> *Pappas* SAC ¶ 42.

Deloitte & Touche USA LLP and its subsidiary, Deloitte & Touche LLP (collectively, "Deloitte USA") are Delaware limited liability partnerships. Together they constitute the United States member firm of the Deloitte organization.[8] Deloitte USA audited Parmalat USA's financial statements from 1999 to 2002.[9]

Deloitte & Touche, S.p.A. ("Deloitte Italy") is an Italian limited liability entity and the Italian member firm of DTT.[10] It audited Parmalat's consolidated financial statements from 1999 to 2002.[11]

### 2.    The Grant Thornton Defendants

Grant Thornton International ("GTI") is an Illinois corporation headquartered in London and the umbrella organization for Grant Thornton entities throughout the world. Grant Thornton LLP ("GT USA") is an Illinois limited liability partnership and the United States member firm of GTI. Grant Thornton S.p.A. ("GT Italy") is an Italian limited liability entity and the Italian member firm of GTI.[12] GT Italy audited the financial statements of Parmalat's off-shore subsidiary,

---

8

   *Id.* ¶¶ 43-44.

9

   *Id.* ¶ 71.

10

   *Id.* ¶ 45.

11

   *Id.* ¶ 161.

   DTT, Deloitte USA, and Deloitte Italy are referred to collectively herein as the "Deloitte Defendants."

12

   *Id.* ¶¶ 35-37.

4

Bonlat Financing Ltd. ("Bonlat") from 1999 to 2002.[13]

### 3. The Bank of America Defendants

Bank of America Corp. ("BA Corp.") is a Delaware corporation and the parent of

Bank of America, N.A. ("BANA"), a national banking association based in North Carolina and

successor of Bank of America National Trust & Savings Association ("BANTSA"). Banc of

America Securities Ltd. ("BAS Ltd.") is a United Kingdom limited liability investment bank and

BANA's wholly owned subsidiary. Its predecessor was Bank of America International Ltd. (BAI).

Banc of America Securities LLC ("BAS LLC"), also a subsidiary of BA Corp., is a Delaware limited

liability investment bank and brokerage firm based in North Carolina.[14]

### 4. The Credit Suisse Defendants

While the complaints are not entirely clear, it appears that there are three Credit

Suisse defendants.

Credit Suisse Group ("CSG") is a Swiss global financial services company with a

branch office in New York City. According to the complaints, an entity called Credit Suisse First

---

13

*Id.* ¶ 311.

GTI, GT USA, and GT Italy are referred to collectively herein as the "Grant Thornton
Defendants."

14

*Id.* ¶¶ 13-22.

BA Corp., BANA, BANTSA, BAS Ltd., BAS LLC, and BAI are referred to collectively
herein as the "Bank of America Defendants."

5

Boston ("CSFB") was its wholly owned subsidiary and investment banking and asset management arm until 2005 when it merged with Credit Suisse ("CS"), which the complaints describe as CSG's private banking division. The complaints appear to name CS as a defendant. If, in fact, that was the intention and if, as plaintiffs suggest, CS is an unincorporated division of CSG, CSG would be a defendant. The Court notes, however, that CSG's Report on Form 6-K for August 2007 describes CS as a wholly-owned subsidiary. In addition, counsel for the Credit Suisse defendants have appeared on behalf of CS rather than CSG. In consequence, the Court concludes that the plaintiffs sued CS, not CSG. In view of the outcome of these motions, however, any uncertainty ultimately is immaterial.

The other two Credit Suisse defendants are Credit Suisse First Boston International ("CSFBI"), a London-based bank, and Credit Suisse Securities (Europe) Limited ("CSSEL"), a London-based broker-dealer.[15]

### 5.    *Banca Nazionale*

Banca Nazionale del Lavoro S.p.A. ("BNL") is an Italian banking conglomerate. It has branches in the United States, including New York and Chicago, and describes itself as one of the world's 100 largest banks. BNL's subsidiary, Ifitalia S.p.A. ("Ifitalia"), is an Italian bank and factoring company.[16]

---

[15]

*Id.* ¶¶ 29-32.

CS, CSFBI, and CSSEL are referred to collectively herein as the "Credit Suisse Defendants."

[16]

*Id.* ¶ 34. Ifitalia is not named as a defendant.

6

### 6.    *Banca Intesa*

Smith's complaint names also Banca Intesa ("Intesa"), one of Italy's largest banking companies, which provides a variety of commercial banking services.[17] Its subsidiary, Nextra Investment Management SGT ("Nextra"), serves as Intesa's asset management and investment banking arm.[18]

## II.    *The Alleged Wrongdoing*

The complaints are long, rambling, repetitious, and disorganized.[19] Their gist, however, can be summed up as follows.

Plaintiffs allege that the Companies were insolvent and completely financially dependent on Parmalat at all relevant times.[20] For example, the notes to Parmalat USA's

---

17

*Smith SAC* ¶¶ 37-38.

18

*Id.* ¶¶ 503, 506. Nextra is not named as a defendant.

19

For example, Smith's second amended complaint is 156 pages and 617 numbered paragraphs. While this is a substantial improvement over the first amended complaint, which was 342 pages long and contained 1309 numbered paragraphs, it still is unnecessarily long. In addition, where allegations concerning a particular topic could have been placed in a single section, plaintiffs instead have spread them among numerous, disparate sections, leaving it to the Court to consolidate relevant allegations to get a coherent picture of the alleged wrongdoing and the relationships among the parties. *See, e.g.,* ¶¶ 47-56, 266-315 (describing Deloitte Defendants and their relationships to one another); *id.* ¶¶ 215-223, 322-343 (alleging wrongdoing related to Bonlat). Moreover, the complaints often lump defendants together, making it unclear which particular defendants are the subject of certain allegations and forcing the Court, where possible, to rely on context to understand plaintiffs' precise meaning. *See, e.g., id.* ¶ 171 (referring to "Deloitte" generally without specifying particular Deloitte entity).

20

*See Pappas* SAC ¶¶ 102-108, 156.

consolidated financial statements for 2002 stated that the company's ability to maintain its then-current debt arrangement, obtain additional financing from third-party lenders, and continue as a going concern was dependent on Parmalat's ability to guarantee Parmalat USA's debt to third parties and Parmalat's forbearance from calling debts owed to it by Parmalat USA.[21]

Because of this dependence on Parmalat, plaintiffs claim, certain "innocent decision makers" at the Companies relied on representations that Parmalat was financially healthy in (1) causing Parmalat USA to incur more than $20 million in debt guaranteed by Parmalat,[22] and (2) causing Farmland to take out a loan in the form of a sale-leaseback transaction, whereby it transferred its dairy processing plants and equipment to a third party and leased them back under leases guaranteed by Parmalat.[23]

Plaintiffs allege, however, that Parmalat in fact was in financial ruin when the Companies entered into these transactions. Certain of Parmalat's officers, directors, and other employees allegedly had looted the company for years and fraudulently concealed the company's true financial condition in its financial statements.[24] Plaintiffs allege that the Companies therefore incurred debt that they were unable to repay once Parmalat collapsed in 2003, thus deepening their insolvency. In addition, the proceeds of the sale-leaseback transaction allegedly were looted by

---

21

   *Id.* ¶ 106.

22

   *Id.* ¶¶ 150-156.

23

   *Id.* ¶¶ 7, 224.

24

   *E.g., id.* ¶ 4.

8

Parmalat insiders.[25]

According to plaintiffs, the innocent decision makers would have prevented the Companies from incurring these liabilities in the first instance, reported the fraudulent acts being committed by Parmalat's insiders, and filed for bankruptcy at an earlier date if they had known the truth about Parmalat's financial condition.[26]

Defendants are charged principally with assisting the Parmalat fraud or otherwise with being complicit in a scheme to hide Parmalat's financial condition. The allegations of defendants' wrongdoing may be divided into three categories.

### A. Misleading Parmalat Financial Statements

The first includes claims that Deloitte Italy and GT Italy helped Parmalat insiders misrepresent Parmalat's financial condition in financial statements. They allegedly did so by (1) failing to reveal in their audit reports that Bonlat was booking fictitious sales to boost Parmalat's reported revenues, and that Bonlat's sole purported asset, a \$4.9 billion bank account, did not exist,[27] (2) participating in a scheme with Parmalat's insiders to reclassify improperly "Parmalat's growing debts to third parties as obligations owed by one Parmalat entity to another,"[28] and (3) deliberately preventing DTT's Maltese member firm ("Deloitte Malta"), which audited Bonlat's parent, Parmalat

---

25

Id. ¶¶ 6-8.

26

See, e.g., id ¶ 159.

27

Id. ¶¶ 195-202; 310-328.

28

Id. ¶ 183.

9

Capital Finance ("PCF"), from receiving Bonlat's audited financial statements for the years 2001 and 2002, thus preventing Deloitte Malta from completing its audit work on PCF's 2002 financial statements and blowing the whistle on the Bonlat fraud.[29]

The complaints allege that Deloitte Italy further assisted the fraud by (4) certifying Parmalat's 2002 financial statements without having received certification of PCF's financial statements for that year,[30] (5) failing to reveal in its audit reports that reimbursement credits issued by Parmalat to its subsidiaries, which the subsidiaries booked as reductions in costs and expenses, were uncollectible,[31] and (6) failing to ensure that a $26.5 million write-down of Parmalat USA's goodwill in 2002 "flowed through" to Parmalat's financial statements.[32]

## B.    Fraudulent Transactions

The second category of allegations includes claims that certain defendants engaged in transactions that permitted Parmalat insiders to misrepresent the company's financial health.

Plaintiffs allege that the Bank of America and Credit Suisse Defendants structured or otherwise participated in fraudulent transactions designed to conceal Parmalat's debt,[33] and that

---

[29]

　　　 *Id.* ¶¶ 207-215.

[30]

　　　 *Id.* ¶ 215.

[31]

　　　 *Id.* ¶¶ 186-190, 193.

[32]

　　　 *Id.* ¶ 191.

[33]

　　　 *See generally id.* ¶¶ 359-437 (allegations against the Bank of America Defendants), 440-454 (allegations against the Credit Suisse Defendants).

10

BNL and Ifitalia repeatedly paid Parmalat cash in exchange for assignment of receivables that both

parties knew were bad, thus permitting Parmalat to record as assets what essentially were loans from

BNL.[34] These allegations are substantially similar to those described in the Court's earlier opinions

in related matters,[35] familiarity with which is assumed, and need not be recounted here.

       In addition, Smith alleges that Intesa assisted Parmalat's insiders in fraudulently

securing financing through the use of a company called Wishaw Trading S.p.A. ("Wishaw").[36]

Although Smith does not so allege, he implies that Parmalat or its employees somehow controlled

Wishaw.[37] According to Smith, Parmalat insiders "used" Wishaw to manufacture fictitious

promissory notes, purportedly representing trade debt owed to Intesa, which Intesa then endorsed

and sold to third parties, thus acting as a "broker/banker of fraudulently obtained loans." The purpose

of the transaction, Smith claims, was to raise money to "prop up Parmalat's ailing Brazilian

operations and to improperly funnel money to" Parmalat's corrupt insiders.[38]

---

[34]

       *See generally id.* ¶¶ 455-474.

[35]

       *See In re Parmalat Sec. Litig.*, 412 F. Supp. 2d 392, 396-399 (S.D.N.Y. 2006) (describing allegations against the Bank of America Defendants); *In re Parmalat Securities Litigation*, 376 F. Supp. 2d 472, 489-90 (S.D.N.Y. 2005) (describing allegations against the Credit Suisse Defendants); *id.* at 488-89 (describing allegations against BNL and Ifitalia).

[36]

       *Smith* SAC ¶ 489.

[37]

       Pleadings in related cases allege that Wishaw is a Uruguayan shell entity controlled by the Tanzi family, the same family that founded and controlled Parmalat. *See In re Parmalat Sec. Litig.*, 383 F. Supp. 2d 587, 591 (S.D.N.Y. 2005). Smith states as much in his memorandum in opposition to Intesa's motion to dismiss. *See* Smith Mem. Opp'n Intesa Mot. Dismiss 1.

[38]

       *Smith* SAC ¶¶ 489-501.

Smith alleges also that in June 2003, Nextra purchased an entire €300 million bond

issue of Parmalat Finance Corporation B.V., which it resold within a few months for a substantial

profit, despite knowing of Parmalat's "disastrous financial condition." According to Smith, this

transaction "artificially propped up Parmalat and concealed Parmalat's true financial condition."[39]

C.      *Deloitte USA*

The third category of allegations involves claims arising from the conduct of Deloitte

USA.

1.      *Auditing Services*

Plaintiffs claim that Deloitte USA misled innocent insiders at the Companies by

issuing unqualified audit opinions of Parmalat USA's financial statements for the years 1999 to

2002.

a.      *Reimbursement Credits*

They allege that Parmalat USA had booked millions of dollars worth of

"reimbursement credits" issued by Parmalat between 1999 and 2002.[40] The credits had been booked

as reductions in costs and expenses and therefore increased Parmalat USA's reported net income and

---

39

   *Id.* ¶ 502.

40

   *Pappas* SAC ¶ 83.

12

assets.[41] Plaintiffs claim, however, that the credits in fact were "uncollectible."[42] They allege that Deloitte USA violated generally accepted auditing standards ("GAAS") by failing to obtain sufficient audit evidence that the credits were genuine despite "red flags" that should have cued it into the fact that they were phony.[43]

In particular, plaintiffs claim that when Deloitte USA conducted a "successor audit" of Parmalat USA in 1999, it discovered that the company had not collected on similar reimbursement credits issued from 1995 to 1998.[44] They allege also that when Deloitte USA "sought confirmation from [Parmalat and Deloitte Italy] of the calculations and nature of the reimbursement credits" and "questioned why the reimbursement credits were accounted for as reimbursement of expenses as opposed to a capital contribution from [Parmalat]," it "did not receive the confirmations and information it requested" because Parmalat and Deloitte Italy "repeatedly refused to provide such audit evidence."[45] Plaintiffs allege further that Carlo Zucchinali of Deloitte Italy sent a January 18, 2000 email to James Pickette, Deloitte USA's audit manager, describing the reimbursement credits as "loss absorptions," or "contributions – income for the receiving company – from other Parmalat

---

41
    *Id.* ¶¶ 77, 85.

42
    *Id.* ¶ 97.

43
    *Id.* ¶¶ 89-94.

44
    *Id.* ¶¶ 76-82.

45
    *Id.* ¶¶ 93-99.

13

companies to cover losses."[46]

According to plaintiffs, Deloitte USA knew or should have known that the reimbursement credits were uncollectible and that Parmalat USA's financial condition was overstated in its financial statements. It therefore acted improperly in failing to qualify its audit opinions.[47]

### b.   *Going Concern Qualifications*

Plaintiffs claim that Deloitte USA failed to issue going concern qualifications in its audit opinions. Because Parmalat USA was financially dependent on Parmalat, they allege, Deloitte USA was required by GAAS either to obtain evidence that Parmalat in fact intended to give, and was capable of giving, continued financial support to Parmalat USA, or to reveal in its audit opinions that there was substantial doubt about the company's ability to continue as a going concern.[48] Plaintiffs claim that Deloitte USA failed to do either.

In connection with its audits of Parmalat USA for the years 1999 to 2001, Deloitte USA allegedly sought only representations from Parmalat's managers that Parmalat would continue to support Parmalat USA. Plaintiffs claim that this was insufficient under GAAS.[49]

On May 8, 2003, in connection with Parmalat USA's 2002 audit, Astrid Potts of

---

46
    *Id.* ¶ 97.

47
    *Id.* ¶ 99.

48
    *Id.* ¶¶ 100-109.

49
    *Id.* ¶¶ 110-115.

14

Deloitte USA allegedly "sought from [Deloitte Italy] and Parmalat-SpA details of the *actual audit evidence* – not just the representation from Parmalat-SpA's management that had become the norm – that [Deloitte Italy] was relying upon to confirm Parmalat-SpA would not call loans to Parmalat-USA due during 2003 and that Parmalat-SpA had the ability to continue to provide financial support to Parmalat-USA."[50] According to plaintiffs, "Lelio Bigogno of [Deloitte Italy] responded that same day to Potts, refusing to provide the requested audit evidence: 'I do not believe that out consideration on the capability of Finanziaria *to support or on whatsoever information about our* audit procedures should be shared with you [sic].'"[51]

Plaintiffs claim that Bigogno's response to Potts should have signaled to Deloitte USA that there was serious doubt about Parmalat's ability and intention to continue supporting the Companies. Nevertheless, plaintiffs allege, Deloitte USA improperly issued an unqualified audit opinion of Parmalat USA's 2002 financial statements.[52]

### (c)    Overstatement of Goodwill

The complaints allege also that Deloitte USA failed to reveal that Parmalat USA's goodwill was overstated in financial statements.

According to plaintiffs, "[f]or the years 2000 and 2001, the goodwill reported on the balance sheet of Parmalat-USA constituted approximately half or more of Parmalat-USA's total

---

50

    *Id.* ¶ 116 (emphasis in original).

51

    *Id.* ¶ 117 (emphasis and [sic] in original).

52

    *Id.* ¶¶ 118-120.

15

reported assets" and that "[r]eported goodwill and other intangible assets totaled approximately $202 million at the end of fiscal year 2000 and $198 million at the end of fiscal year 2001."[53] Plaintiffs allege that "the results of the underlying operations of Parmalat-USA and its subsidiaries did not justify" the reported values.[54]

When it became clear that the company's goodwill was overstated, Deloitte USA and Parmalat USA reduced reported goodwill by $26.5 million. Plaintiffs contend that "even this write-down was not sufficient."[55] They allege that Deloitte USA knew or should have known that Parmalat USA's goodwill was misstated, and that had it conducted its audits in accordance with GAAS, it would have revealed this in its audit opinions.[56]

### 2. *The Sale-Leaseback Transaction*

The remaining allegations against Deloitte USA arise from a 2003 transaction between Farmland and General Electric Capital Corporation ("GECC").

---

53

  *Id.* ¶ 129.

54

  *Id.* ¶ 130.

55

  *Id.* As noted, plaintiffs allege also that "Deloitte" failed to ensure that this write-down "flow[ed] through" to Parmalat's consolidated financial statements. *Id.* ¶ 131. They do not specify to which Deloitte entity they refer in making this allegation. But plaintiffs suggest elsewhere in the pleadings that it was Deloitte Italy that was responsible for ensuring that adjustments to the Companies' financial statements "flowed through" to Parmalat's financial statements. *See id.* ¶ 191.

56

  *Id.* ¶ 132.

### a. The Proposed Deal

The complaints allege that, in late 2002, Parmalat's corrupt insiders "desperately needed increasing amounts of cash in order to fund their fraudulent scheme." Parmalat hired Citigroup Global Markets ("CGM") to locate an investor to provide financing using Farmland's assets as security.[57] GCM found GECC.

GECC and Parmalat initially contemplated that GECC would lend $200 million to Farmland in the form of a sale-leaseback transaction – Farmland would transfer its dairy processing plants and equipment to GECC in exchange for $200 million in cash and then lease the assets back. It allegedly "was understood that the financing would be upstreamed to Parmalat-SpA and that Parmalat-SpA was the ultimate creditor." Parmalat therefore would guarantee the leases.[58] The transaction later was restructured and divided into two tranches, the first of which was $100 million and the second $94 million.[59]

GECC required that it be provided with Parmalat USA's audited financial statements for the years 2000 and 2001. During the winter of 2002 and the spring of 2003, Deloitte USA provided GECC with the requested documents. Plaintiffs allege that "GECC also received Parmalat-USA's unaudited financial statements for 2002."[60]

GECC required also that Farmland's dairy processing equipment be appraised. This

---

57

    *Id.* ¶ 223.

58

    *Id.* ¶ 224.

59

    *Id.* ¶ 240.

60

    *Id.* ¶¶ 225-226.

was in part because GECC required "the outstanding loan amount to be over-collateralized at all times by at least 30% (i.e., 1.3 times)." GECC therefore required Farmland's assets to be worth at least $252.2 million, or 130 percent of $194 million.[61]

### b.    The Deloitte USA-Deloitte Italy Dispute

Plaintiffs allege that, in September 2002, CGM "requested" that GECC use Deloitte USA as the appraiser of Farmland's assets.[62] When Adolfo Mamoli of Deloitte Italy found out about this, he objected vigorously, claiming that the appraisal assignment necessarily would compromise Deloitte USA's independence with respect to its audits of Parmalat USA. That is, Mamoli complained that if Deloitte USA served both as an appraiser of Farmland's assets and as auditor of Parmalat USA, it ultimately would have to audit a transaction, the value of which would have been based upon its own appraisal. Plaintiffs allege that Mamoli voiced his objection repeatedly between September 5, 2002 and January 16, 2003.[63]

Charles Horstmann, DTT's global director of ethics and independence, "was responsible for mediating disputes between [Deloitte] member firms, including those arising out of the Parmalat account." Horstmann, "on behalf of DTT and at the request of [Deloitte USA]," allegedly intervened in the dispute between Deloitte USA and Deloitte Italy.[64] Plaintiffs allege that

---

61

    *Id.* ¶¶ 240-241.

62

    *Id.* ¶ 227.

63

    *Id.* ¶¶ 228-229.

64

    *Id.* ¶¶ 268-269.

Horstmann was able to "persuade Mamoli to withdraw his objection" "[a]fter a long series of e-mails, telephone conversations, and at least one face-to-face meeting." Mamoli allegedly withdrew his objection "even though the substance of that objection was not resolved."[65]

## c. *The Appraisal*

Sometime in March 2003, "GECC executed a letter agreement with [Deloitte USA] dated February 21, 2003, whereby [Deloitte USA] agreed to appraise" the property that would be subject to the sale-leaseback transaction.[66]

On April 30, 2003, Deloitte USA issued an appraisal report. According to plaintiffs, the report inflated the appraisal value of Farmland's assets. It allegedly reported an appraisal value of $252.5 million – more than enough to meet GECC's collateralization requirements for a $194 million transaction – even though an appraisal performed in 1999 by Daley-Hodkin Appraisal Corporation ("DHAC") valued Farmland's assets at about $35 million. Plaintiffs contend that Deloitte USA's appraisal report "provided no explanation or justification for an over seven-fold increase in the value of Farmland's assets in four years, despite Farmland having reported substantial operating losses over the same period."[67]

---

65

*Id.* ¶¶ 230-232.

66

*Id.* ¶ 233. Plaintiffs allege that Deloitte USA then attempted to resolve the independence issue raised by Mamoli by establishing a "Chinese Wall" between the team responsible for appraising Farmland and the team that audited Parmalat USA. According to plaintiffs, however, the wall was "porous," and in any event imposed a scope limitation on Deloitte USA's audit of Parmalat USA in violation of GAAS. *Id.* ¶ 235.

67

*Id.* ¶¶ 238-243.

Plaintiffs allege that the overvaluation stemmed from the fact that Deloitte USA "ignored two of the three basic approaches to valuation[, t]he Cost Approach and the Market Comparable Approach," and instead applied only the "Discounted Cash Flow Approach."[68] Moreover, plaintiffs allege, in applying the discounted cash flow approach, Deloitte USA relied on "calculated" instead of actual values for Farmland's 2001 and 2002 earnings before income taxes, depreciation, and amortization ("EBITDA"). Deloitte USA allegedly stated in its appraisal report that Farmland's EBITDA for 2002 was unavailable, and therefore projected the company's 2003 EBITDA value and then "calculated" EBITDA values for previous years "by reducing the 2003 projections by 2.5% per year." Plaintiffs claim that Deloitte USA did this despite knowing Farmland's actual EBITDA values for 2002. According to plaintiffs, Deloitte USA's "calculated" EBITDA values "far exceeded" the actual values.[69]

### d.    The Aftermath

On the same day that Deloitte USA issued its appraisal report, Farmland transferred its dairy processing plants and equipment to GECC for $100 million. It agreed to make periodic lease payments totaling $50 million plus interest and costs and a residual payment of $50 million at the end of the lease term.[70] Although plaintiffs do not so allege, the complaints imply that this $100 million transaction represented only the first tranche of sale-leaseback transaction.

---

[68]    *Id.* ¶¶ 244-245.

[69]    *Id.* ¶¶ 245-247.

[70]    *Id.* ¶ 7.

In February 2004, Farmland was unable to make its lease payments. Moreover, as Parmalat already had been declared insolvent in Italy, Parmalat "failed to honor its obligations under its guarantee given to GECC."[71]

Plaintiffs claim that the sale-leaseback transaction would not have gone forward if Farmland's assets had been valued properly. They claim that a proper appraisal would have revealed not only that the transaction was not sufficiently collateralized to meet GECC's requirements, but also that there were substantial doubts about the Companies' abilities to continue as going concerns.[72] Hence, plaintiffs contend that Farmland would not have incurred a liability on which it ultimately defaulted when Parmalat collapsed if Deloitte USA had acted properly.[73]

The complaints allege also that, after Farmland entered into the sale-leaseback transaction and received the $100 million from GECC, Parmalat's insiders "looted the cash by causing Farmland to ultimately divert $20 million to Parmalat's Canadian operations and $80 million to Parmalat" itself.[74]

III.    *Causes of Action*

Plaintiffs assert causes of action against all defendants for aiding and abetting breach

---

[71]

*Id.* ¶ 253.

[72]

*See id.* ¶¶ 245 (alleging that Deloitte USA overvalued Farmland's assets in order to make sure that GECC's collateralization requirement was met), 248 (proper appraisal would have called into question "the viability of Parmalat-USA and its subsidiaries as going concerns").

[73]

*Id.* ¶ 65.

[74]

*Id.* ¶ 7.

of fiduciary duty[75] and fraud[76] by the Parmalat insiders, as well as for participating in a civil conspiracy to conceal Parmalat's financial condition.[77] They allege also violations by the Bank of America and Deloitte Defendants of the federal and New Jersey Racketeer Influenced and Corrupt Organizations Acts ("RICO")[78] based on alleged predicate acts of mail and wire fraud.[79] In connection with the auditing services Deloitte USA provided to the Companies, plaintiffs sue the Deloitte Defendants for fraud,[80] negligent misrepresentation,[81] and professional malpractice.[82] Finally, Smith asserts a claim against the Bank of America, Deloitte, and Grant Thornton Defendants for aiding and abetting a fraudulent transfer of Farmland's assets.[83]

The Deloitte, Bank of America, and Credit Suisse Defendants, as well GTI, GT USA, and BNL move to dismiss the claims against them in both complaints. In addition, Intesa moves to

---

[75]

Pappas SAC Count I; Smith SAC Count I.

[76]

Pappas SAC Count II; Smith SAC Count III.

[77]

Pappas SAC Count VI; Smith SAC Count VII.

[78]

18 U.S.C. § 1961 et seq.; N.J.S. 2c:41-1 et seq.

[79]

Pappas SAC Count VII; Smith SAC Count VIII.

[80]

Pappas SAC Count III; Smith SAC Count IV.

[81]

Pappas SAC Count IV; Smith SAC Count V.

[82]

Pappas SAC Count V; Smith SAC Count VI.

[83]

Smith SAC Count II.

The Court has jurisdiction pursuant to 28 U.S.C. § 1334.

dismiss the claims against it in Smith's complaint.

## Discussion

### I. Standard

In deciding a motion to dismiss, the Court ordinarily accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor.[84] Until recently, it frequently was said that dismissal is inappropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[85] This standard, however, has been supplanted. Now, in order "[t]o survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"[86]

In addition, Federal Rule of Civil Procedure 9(b) requires allegations of fraud and breach of fiduciary duty consisting of fraud by a fiduciary to be stated with particularity.[87] While the rule allows general averments of intent, knowledge, and other mental conditions, it nevertheless

---

84

Levy v. Southbrook Int'l Invs., Ltd., 263 F.3d 10, 14 (2d Cir. 2001), cert. denied, 535 U.S. 1054 (2002)).

85

Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

86

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., __ F.3d __, 05-5132-cv, 2007 WL 1989336, *5 (2d Cir. Jul. 11, 2007) (quoting Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007)); see also Iqbal v. Hasty, __ F.3d __, 05-5768-CV (L), 2007 WL 1717803,*11 (2d Cir. June 14, 2007) (discussing breadth of Bell Atl. holding and declining to limit it solely to the antitrust context).

87

FED. R. CIV. P. 9(b); Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC., 479 F. Supp. 2d 349, 359-60 (S.D.N.Y. 2007).

requires a plaintiff to allege facts that give rise to a "strong inference" of the defendant's culpable state of mind.[88] This may be done by alleging facts that the defendant had both motive and opportunity to commit or assist fraud, or facts that constitute strong circumstantial evidence of the defendant's conscious misbehavior or recklessness.[89]

## II.   Choice of Law

Plaintiffs argue that New Jersey law applies to all of their claims. Some defendants resist this; others do not. However, the parties point to no conflict between the law of the forum and that of any other state with respect to the issues necessary to dispose of these motions. Accordingly, the Court applies New York law.[90]

## III.   Injury

The complaints allege two kinds of injury to the Companies. First, plaintiffs contend that defendants' improper actions misled innocent decision makers at the Companies about

---

[88]

See, e.g., Fraternity Fund, 479 F. Supp. 2d at 360, 367; see also Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S.Ct. 2499, 2510 (2007) (plaintiff must allege facts that give rise to "strong inference" of fraudulent intent, which means inference "must be cogent and compelling, thus strong in light of other explanations").

[89]

E.g., Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC, 376 F. Supp. 2d 385, 404 (S.D.N.Y. 2005) (quoting Acito v. IMCERA Group, 47 F.3d 47, 52 (2d Cir. 1995) (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994))).

[90]

See, e.g., Antaeus Enters., Inc. v. SD-Barn Real Estate, L.L.C., 480 F. Supp. 2d 734, 740 (S.D.N.Y. 2007) (law of forum applies if no conflict is shown to exist (citing Faulkner v. Nat'l Geographic Soc., 452 F. Supp. 2d 369, 375 n.25 (S.D.N.Y. 2006); Carroll v. LeBoeuf, Lamb, Green & MacRae, L.L.P., 392 F. Supp. 2d 621, 625 n.21 (S.D.N.Y. 2005))); In re Parmalat Sec. Litig., 479 F. Supp. 2d 332, 342 n.56 (S.D.N.Y. 2007).

Parmalat's financial health. Believing, incorrectly, that Parmalat could provide the Companies with continuing financial support and guarantee its loans, the innocent decision makers caused the already-insolvent Companies to incur debt they were unable to pay, thus deepening their insolvency. Second, plaintiffs claim that the $100 million GECC paid to Farmland as part of the sale-leaseback transaction was looted by Parmalat's corrupt insiders.

### A. Deepened Insolvency

The parties devote a great deal of space to arguing whether courts recognize "deepened insolvency" damages or "deepening insolvency" causes of action. But this ultimately is beside the point, as plaintiffs have failed adequately to allege that the Companies were injured when they allegedly were induced to incur debt, whatever the claimed injury should be labeled.

### 1. Debt and Insolvency

Plaintiffs assume that the mere act of incurring debt when a company already is insolvent – that is, when its liabilities are greater than the value of its assets[91] or when it is unable to repay its existing debt[92] – necessarily deepens the company's insolvency. This is not the case.

---

91

> See 11 U.S.C. § 101(32)(A) (a corporation is insolvent when "the sum of [the] entity's debts is greater than all of [the] entity's property, at a fair valuation"); Sabin Willett, *The Shallows of Deepening Insolvency*, 60 BUS. LAW. 549, 552 (2005) [hereinafter, "*Shallows*"] (describing "balance sheet insolvency" as the condition where liabilities are greater than the value of assets).

92

> See, e.g., OXFORD ENGLISH DICTIONARY, "Insolvent" ("Unable to pay one's debts or discharge one's liabilities; bankrupt.") (*available at* http://dictionary.oed.com/cgi/entry/50118117?single=1&query_type=word&queryword =insolvent&first=1&max_to_show=10) (last visited July 31, 2007); *see also* BLACK'S LAW

25

When, for example, a company borrows cash and receives the full amount of the loan, it receives an asset that directly offsets the newly incurred liability on its balance sheet. In other words, the company "expand[s] debt in *precise* proportion – dollar-for-dollar proportion – to the expansion of assets in the form of new cash."[93] The difference between the company's assets and liabilities therefore remains the same. Its ability to pay its debts as they become due is no worse; indeed, it may be better. The company's insolvency is no greater than before.[94]

The Ninth Circuit recognized this in *Rochelle v. Marine Midland Grace Trust Co. of New York*.[95] Rochelle, the trustee of a bankrupt company, Sunset, sued directors, officers, and auditors for mismanaging, looting, and otherwise breaching duties owed to the company. He asserted claims under the federal securities laws, arguing that Sunset was injured when the defendants misrepresented the company's financial health in order to secure loans that the company actually was unable to pay, thus deepening Sunset's insolvency. The court noted, however, that because Sunset received the full amount of the loans, it suffered no loss on the loan transactions in question. The

---

DICTIONARY (8th ed. 2004), "Insolvent" ("having liabilities that exceed the value of assets; having stopped paying debts in the ordinary course of business or being unable to pay them as they fall due"); *Shallows*, 60 BUS. LAW. at 552 (describing "cash-flow insolvency" – "where a company intends or believes that it will incur debts that would be beyond its ability to pay as those debts mature" – and "low capital insolvency" – "where a company engages in a business or transaction that its capital is simply too small to protect against the risk of future setbacks").

93

*Shallows*, 60 BUS. LAW. at 555.

94

From the point of view of creditors, the company's insolvency in some circumstances may become *shallower* as a result of its incurrence of new debt. *See Shallows*, 60 BUS. LAW. at 552-53.

95

535 F.2d 523 (9th Cir. 1976).

court thus observed that Rochelle's theory was that Sunset's injury was caused not by the incurrence of debt, but rather by management's subsequent squandering of the loan proceeds. This, the court concluded, amounted to a claim of corporate mismanagement, and was not actionable under the securities laws.[96]

The point is that a company's insolvency is not deepened simply by the incurrence of new debt where the company suffers no loss on the loan transaction.[97] The insolvency is deepened when, for example, the proceeds of the loan are squandered or assets otherwise are looted.[98] It is at that point that the gap between liabilities and assets widens and the ability to service outstanding debt is impaired.

The Companies are not alleged to have suffered any loss on the loan transactions in question. Accordingly, it would be misleading to refer to any injury the Companies may have

---

[96]

> *See id.* at 528-29; *see also In re Investors Funding Corp. of New York Sec. Litig.*, 523 F. Supp. 533, 539 (S.D.N.Y. 1980) ("Since [company] received more than fair value in exchange for its debentures and other securities, it was not damaged until the proceeds from such sales were subsequently misused.")

[97]

> *See Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 991 (2d Cir. 1981) (construing statute limiting when bankruptcy trustee can set aside obligation incurred by debtor and concluding that "if the debtor receives property or discharges or secures an antecedent debt that is substantially equivalent in value to the property given or obligation incurred by him in exchange, then the transaction has not significantly affected his estate and his creditors have no cause to complain"); *cf. In re CitX Corp., Inc.*, 448 F.3d 672, 677 (3d Cir. 2006) (use of fraudulent financial statements to raise $1 million in capital from investors did not deepen insolvency, but in fact made it shallower).

[98]

> *See Investors Funding Corp.*, 523 F. Supp. at 539; *see also In re Global Serv. Group, LLC*, 316 B.R. 451, 461 (S.D.N.Y. Bankr. 2004) (allegations that management prolonged the life of an insolvent corporation that continues to incur debt, without more – such as an allegation that management subsequently misappropriated the funds received – does not state a claim for relief); *see also CitX*, 448 F.3d at 677 (increase in insolvency does not occur when there is a capital infusion, but when the cash subsequently is looted or squandered).

27

suffered by incurring debt as "deepened insolvency." This is not to say, however, that the Companies necessarily suffered no injury at all.[99]

### 2. *Debt and Injury*

In *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*,[100] the successors of two bankrupt corporations alleged that the corporations had been induced fraudulently to incur debt that they were unable to pay, thereby forcing them into bankruptcy. Although the Third Circuit framed the issue as whether Pennsylvania recognizes a cause of action for "deepening insolvency,"[101] it addressed the underlying question – whether the corporations could have suffered any injury as a result of the alleged fraud. The court wrote:

> "Even when a corporation is insolvent, its corporate property may have value. The fraudulent and concealed incurrence of debt can damage that value in several ways. For example, to the extent that bankruptcy is not already a certainty, the incurrence of debt can force an insolvent corporation into bankruptcy, thus inflicting legal and administrative costs on the corporation. When brought on by unwieldy debt, bankruptcy also creates operational limitations which hurt a corporation's ability to

---

99

Cf. *In re Parmalat Sec. Litig.*, 383 F. Supp. 2d 587, 601-02 (S.D.N.Y. 2005) (declining to recognize deepening insolvency cause of action under North Carolina law where injuries plaintiff complained of were equally compensable under more traditional tort theories, such as breach of fiduciary duty).

100

267 F.3d 340 (3d Cir. 2001).

101

As the court stated in a subsequent case,

"[a]lthough [in *Lafferty*] we did describe deepening insolvency as a 'type of injury,' and a 'theory of injury,' we never held that it was a valid theory of damages for an independent cause of action. Those statements in *Lafferty* were in the context of a deepening-insolvency *cause of action*. They should not be interpreted to create a novel theory of damages for an independent cause of action like malpractice." *CitX*, 448 F.3d at 677 (citations omitted; emphasis in original).

run its business in a profitable manner. Aside from causing actual bankruptcy, deepening insolvency can undermine a corporation's relationships with its customers, suppliers, and employees. The very threat of bankruptcy, brought about through fraudulent debt, can shake the confidence of parties dealing with the corporation, calling into question its ability to perform, thereby damaging the corporation's assets, the value of which often depends on the performance of other parties. In addition, prolonging an insolvent corporation's life through bad debt may simply cause the dissipation of corporate assets.

"These harms can be averted, and the value within an insolvent corporation salvaged, if the corporation is dissolved in a timely manner, rather than kept afloat with spurious debt."[102]

Plaintiffs do not claim that defendants' actions ultimately drove the Companies into

bankruptcy. Indeed, they allege that the Companies already were insolvent by 1999 and would have

filed for bankruptcy even sooner than they did had Parmalat's true financial condition been revealed.

Nor do plaintiffs allege that the Companies' incurrence of new debt harmed their business

relationships, reputations, or otherwise hindered their operations. The complaints instead appear to

draw on *Lafferty*'s final theory of damages – that "prolonging [the Companies'] life through bad debt

. . . cause[d] the dissipation of corporate assets."[103]

Plaintiffs allege that innocent decision makers at the Companies would have sought

"an orderly reorganization or liquidation of [the Companies] at a much earlier date, thus preserving

---

102

> *Lafferty*, 276 F.3d at 349-50 (citations omitted); *see generally* J.B. Heaton, *Deepening Insolvency*, 30 J. Corp. L. 465 (Spring 2005) (wrongfully incurred debt may cause a company injury in the form of "costs of financial distress" – such as the administrative costs of bankruptcy, or a decline in assets and profits as a result of damaged reputation – but company is not harmed by amount of wrongfully incurred debt). *But see Shallows*, 60 Bus. Law at 564-67 (critiquing *Lafferty*'s reasoning).

103

> *Id.* at 350.

assets,"[104] had Parmalat's insolvency been revealed. In other words, plaintiffs claim that the
Companies were injured in that they were induced to delay filing for bankruptcy.

### *a.    Delayed Liquidation*

Although plaintiffs assume that delayed liquidation and delayed reorganization would

have injured the Companies equally, there is a critical difference. If the Companies were insolvent

by 1999 and liquidation was inevitable, then they had nothing to lose simply by continuing to

operate, even if that would have meant the continued depletion of their assets. As one commentator

writes,

> "In a liquidation, assets will be sold and the proceeds distributed to creditors. [In
> cases where] liquidation is inevitable . . . [the harm caused by delayed bankruptcy
> filing is a] harm to the beneficiaries of that liquidation – the creditors. The
> corporation is no more one of them than the deceased is a beneficiary at the reading
> of his own will. If asset liquidation is the inevitable best case, the corporation is
> defunct. Delay does not hinder its ability to purchase raw material, operate its
> factories, sell widgets, collect receivables, make payroll, or sponsor the Mite A
> hockey team. All of those attributes of corporate life are gone, and once again we are
> adding insult only to death."[105]

Accordingly, insofar as plaintiffs claim that the Companies were induced to delay in liquidating, they

have failed to allege harm to the Companies themselves. And they of course lack standing to recoup

damages suffered by others, such as the Companies' creditors.[106]

---

104

     *Pappas* SAC ¶ 159.

105

     *Shallows*, 60 BUS. LAW. at 566.

106

     *E.g.*, *In re Parmalat Sec. Litig.*, 383 F. Supp. 2d 587, 594 (S.D.N.Y. 2005) (citing cases).

### b. Delayed Reorganization

However, insofar as plaintiffs claim that the Companies were injured because they were induced to delay filing for reorganization, the conclusion may be different.

#### (1) Parmalat USA

Parmalat USA currently is in liquidation. If, however, Parmalat USA, at some point prior to February 2004, might have filed for reorganization and continued operating under bankruptcy protection instead of simply liquidating, it arguably missed the opportunity to fight for survival under bankruptcy protection. Its successor in interest then might have a case if he could establish that defendants' actions caused the company to miss that opportunity.

The complaints allege few facts concerning Parmalat USA's financial condition prior to February 2004. They allege that Parmalat USA's financial statements for the years 2000 to 2002 reported that the company's insolvency – the amount by which liabilities exceeded assets – increased from about $40 million to about $47.5 million.[107] This hardly establishes, however, that reorganization and continued operation would have been a viable option had the company filed for bankruptcy sooner than it did. The allegations, if proven, would leave a fact finder to speculate not only as to whether Parmalat USA would have filed for bankruptcy sooner,[108] but also as to whether the trustees would have sought reorganization as opposed to liquidation, and whether a plan for

---

107

*Pappas* SAC ¶ 103.

108

Simply because a company is insolvent does not mean it necessarily will file for bankruptcy. *Global Serv. Group*, 316 B.R. at 460 (unlike some jurisdictions, American law does not require company's management to file for bankruptcy, but leaves the decision up to proper business judgment).

reorganization would have been approved. This is too much. Plaintiffs have not supplied factual

allegations sufficient to raise a right to relief above the speculative level.

### (2)   Farmland

Farmland is in a slightly different boat, as it filed for reorganization, and a plan was

approved. It therefore was not deprived of the opportunity to fight for survival under bankruptcy

protection. Nevertheless, it perhaps could be argued that Farmland was injured because it emerged

from bankruptcy with a lower enterprise value than it otherwise would have as result of being

induced to delay reorganization.

The viability of this theory is not free from doubt.[109] Regardless, plaintiffs do not

allege that Farmland operated at a loss or that its assets diminished in value simply as a result of the

company's continued operations.[110] The allegations therefore do not support the conclusion that

---

109

*See Shallows*, 60 BUS. LAW. at 567-68 (discussing theory and potential problems).

110

Plaintiffs do allege that Farmland's assets were depleted when they were up-streamed to
Parmalat and subsequently looted. Allegations that the Companies were injured by
corporate looting are dealt with more fully below. The present question, however, is not
whether earlier bankruptcy would have prevented intervening factors, such as the Parmalat
fraud, from affecting Farmland. Rather, it is whether the mere continuation of Farmland's
operations outside of bankruptcy left the company worse off – that is, whether the mere
incurrence of debt, separate and apart from what happened to the loan proceeds, caused
injury to the company.

As noted, plaintiffs allege that the consolidated financial statements of "Parmalat USA and
its subsidiaries" revealed that Parmalat USA's insolvency increased by about $7.5 million
between 2000 and 2002, *Pappas* SAC ¶ 103, during which period Parmalat USA incurred
more debt, *id.* ¶ 151. This may suggest that Parmalat USA's assets were losing value. The
reference to "Parmalat USA and its subsidiaries" however is quite vague and does not
specify Farmland in particular. The allegations therefore do not indicate whether the assets
of Farmland itself were losing value.

32

earlier rather than later bankruptcy would have stemmed any additional losses or left the company with more assets.

Even if plaintiffs had alleged that Farmland's assets were depleted merely by continued operations, the allegations still would fail. It is too speculative to conclude that an earlier reorganization would have left Farmland, as opposed to some other interested party, better off. Bankruptcy reorganization is an inherently flexible process, as a bankruptcy court has broad equitable powers to craft a reorganization plan. In exercising those powers, a court must consider the interests of a number of relevant parties, including not only the debtor, but also its creditors.[111] Given this flexibility – and the paucity of allegations concerning Farmland's financial condition before February 2004 – it is difficult, perhaps impossible, to say what a hypothetical reorganization plan might have looked like had Farmland filed for bankruptcy protection at some unspecified earlier date. Even assuming that Farmland's estate would have been more valuable if bankruptcy protection had been sought earlier, it is far from clear that any of this additional value necessarily or probably would have been left to Farmland, as opposed to distributed to its creditors or other interested parties. Hence, too much speculation is required to conclude that Farmland itself would have benefitted from earlier bankruptcy protection. Accordingly, even if the complaints contained allegations supporting this theory of injury, they would not raise plaintiffs' right to relief beyond the speculative level.

---

111

> *See, e.g., Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 389 (1993) ("In overseeing [the Chapter 11 reorganization] process, the bankruptcy courts are necessarily entrusted with broad equitable powers to balance the interests of the affected parties, guided by the overriding goal of ensuring the success of the reorganization."); *N.L.R.B. v. Bildisco*, 465 U.S. 513, 525 (1984) (noting that flexibility and equity are "built into" Chapter 11).

* * *

In sum, while the incurrence of debt by itself cannot deepen a company's insolvency, the Court is not prepared to conclude that it never can cause injury to an insolvent company. But plaintiffs nevertheless have failed to allege that it caused injury to the Companies in this case. Accordingly, plaintiffs' claims must be dismissed insofar as they seek damages for the Companies' wrongful incurrence of debt.

### B.    Looting

This does not dispose of all of plaintiffs' claims, however. The complaints allege that Farmland acquired $100 million as part of the sale-leaseback transaction, and that this money subsequently was looted when Parmalat insiders diverted the funds to other Parmalat entities. As the foregoing analysis indicates, the looting of the proceeds of a loan can constitute an injury to a company.[112] Even assuming the truth of plaintiffs' allegations, however, the question whether the complaints adequately allege that defendants' actions caused the Companies' injuries would remain.

### IV.    Causation

Plaintiffs cannot succeed on any of their claims unless they establish that defendants' conduct caused the Companies' losses. It is not sufficient that they show "but for" causation. They

---

112

As indicated above, *this* deepens a corporation's insolvency, as it leaves the corporation not only with a new liability but also fewer assets. It therefore might be appropriate to identify the injury caused by the looting of loan proceeds as "deepened insolvency." But the Court sees little reason to do so. The traditional name – looted assets – is sufficient.

must prove also that defendants' actions were the proximate cause of the Companies' losses.[113]

### A.    Defendants Other Than Deloitte USA

In *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*,[114] the trustee of a bankrupt company alleged a massive scheme in which the company's officers and controlling stockholders mismanaged the firm and looted corporate funds. The trustee sued, among others, a law firm in connection with its preparation of the company's SEC filings and other documents, which allegedly misrepresented the company's financial condition. The trustee claimed that these misrepresentations allowed the company to raise large amounts of capital, which ultimately was looted as part of the ongoing fraud at the company. The Second Circuit held, however, that this was insufficient to plead loss causation under the securities laws, as it amounted merely to a claim of "but for" causation. The company's alleged losses, the court held, were caused by theft or mismanagement of corporate funds, not the raising of the funds that occurred with the defendant's help.[115]

---

113

> *See, e.g.*, *Fraternity Fund*, 479 F. Supp. 2d at 370-71 (aiding and abetting fraud and breach of fiduciary duty); *First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369, 379 (S.D.N.Y. 2002) (federal RICO); *Duane Jones Co. v. Burke*, 306 N.Y. 172, 190-91, 117 N.E.2d 237, 246 (1954) (civil conspiracy); *Kristina Denise Enters., Inc. v. Arnold*, 838 N.Y.S.2d 667, 667 (2d Dep't 2007) (accounting malpractice); *Gerber Trade Finance, Inc. v. Skwiersky, Alpert & Bressler, LLP*, 12 A.D.3d 286, 286, 786 N.Y.S.2d 9, 10 (1st Dep't 2004) (negligent misrepresentation); *Laub v. Faessel*, 297 A.D.2d 28, 30-31, 745 N.Y.S.2d 534, 536 (1st Dep't 2002) (fraud, negligent misrepresentation, and breach of fiduciary duty (citing cases)); *Interchange State Bank v. Veglia*, 286 N.J. Super. 164, 178, 668 A.2d 465, 472 (N.J. Super. App. Div. 1995) (New Jersey RICO).

114

> 754 F.2d 57 (2d Cir. 1985).

115

> *Id.* at 61-62 ("Any damage sustained by IFC, the only cognizable plaintiff here, occurred later, after the securities transactions were completed, when the proceeds of those transactions were allegedly funneled into unwise investments or diverted to the personal

Plaintiffs allege that Parmalat's true financial condition would have been revealed had defendants acted properly and that either the innocent decision makers at the Companies or GECC would not have allowed the sale-leaseback transaction to go forward. They do not allege, however, that any of the defendants, with the exception of Deloitte USA, had any connection to the Companies or even knew about, assisted, or otherwise participated in the sale-leaseback transaction, let alone the looting of the proceeds. Absent such allegations, the Court fails to see how the Companies' losses were a foreseeable result of these defendants' alleged schemes to hide Parmalat's financial condition. As in *Bloor*, plaintiffs perhaps allege that "but for" defendants' actions, the Companies would not have acquired the money that ultimately was looted. But they fail to allege that these defendants could have foreseen not only that the sale-leaseback transaction would have taken place, but also that the proceeds would have been squandered.

Plaintiffs cite the Court's decision in a related case brought by Dr. Enrico Bondi, the Italian representative of Parmalat's bankrupt estate.[116] Dr. Bondi, like plaintiffs here, sued the Bank of America Defendants and others for structuring fraudulent transactions that concealed Parmalat's

---

use of the Danskers. . . . [T]he failure of the corporation to use proceeds wisely or the theft of corporate funds by officers was hardly a reasonably foreseeable result, let alone the direct result, of any of Carro Spanbock's alleged actions.").

Although *Bloor* involved securities fraud claims and thus invoked the concepts of "transaction causation" and "loss causation," *see id.* at 61, the decision hinged on the plaintiff's inability to show loss causation, *see id.* at 61-62, which the Second Circuit has held embodies the traditional notion of proximate cause, *see AUSA Life Ins. Co. v. Ernst and Young,* 206 F.3d 202, 209 (2d Cir. 2000) ("Loss causation is causation in the traditional 'proximate cause' sense – the allegedly unlawful conduct caused the economic harm." (citing *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 380 (2d Cir. 1974)); *accord Laub,* 297 A.D.2d at 31, 745 N.Y.S.2d at 536 ("Loss causation is the fundamental core of the common-law concept of proximate cause." (citing authority)).

116

*Parmalat,* 412 F. Supp. 2d 392.

mounting losses. The Court held that Dr. Bondi adequately pleaded proximate cause where he

alleged that the defendants' "material omissions lulled Parmalat's innocent insiders into a false sense

of security in the health of the Company" and that "the innocent insiders relied on the mirage" in

failing to investigate further and thus failing to discover and halt the fraud.[117]

   Dr. Bondi's case, however, involved a substantially shorter chain of causation than

plaintiffs allege here. It is reasonably foreseeable that misrepresenting a company's financial

condition, and thus hiding from its innocent managers that the company is being driven into the

ground, will cause the company harm. But it is significantly less foreseeable that doing so will cause

a subsidiary with which the defendant has no contact to enter into a transaction of which the

defendant has no knowledge and that the subsidiary subsequently will be injured when the proceeds

are upstreamed to the parent and looted by its corrupt insiders. In other words, even assuming

plaintiffs adequately have alleged that defendants helped perpetuate the Parmalat fraud, they have

not alleged that it was foreseeable that the assets of one of Parmalat's subsidiaries would get swept

into that scheme and looted and that the Companies thus would be injured.

   Accordingly, plaintiffs have failed to plead proximate cause as to defendants other

than Deloitte USA.


  *B.*  *Deloitte USA*

   Deloitte USA is in a unique position because it audited the Companies and appraised

Farmland's assets for purposes of the sale-leaseback transaction. The question, however, is whether

---

117

   *Id.* at 403-04.

these connections made it reasonably foreseeable to Deloitte USA that causing Farmland to enter into the sale-leaseback transaction would result in the looting of the proceeds.

The district court in the *Bloor* case held that neither auditors who overstated the victim company's financial condition in audit reports nor appraisers who overvalued its assets were liable when the money raised as a result of these misrepresentations eventually was looted by the company's management. "While it was arguably foreseeable that, as a result of [the defendants' actions], securities issued and sold by [the company] would command a higher price than their true value, thus injuring purchasers and providing excessive funds to the corporation, it was not reasonably foreseeable that inside management of [the company] would embezzle the funds so received for their personal use."[118]

Plaintiffs argue that this case is different because Deloitte USA knew that the proceeds of the sale-leaseback transaction would be upstreamed to Parmalat and that Parmalat was being looted by corrupt insiders. It therefore could have foreseen that if Farmland entered into the sale-leaseback transaction, the proceeds would be swept up into the Parmalat fraud. The question thus becomes whether plaintiffs adequately have alleged Deloitte USA's knowledge of the Parmalat fraud.

### *1.    Direct Knowledge*

To the extent that plaintiffs rely on allegations that Deloitte USA in fact knew that

---

[118]

> *See In re Investors Funding Corp. of New York Sec. Litig.*, 566 F. Supp. 193 (S.D.N.Y. 1983) (appraisers) (citing *In re Investors Funding Corp. of New York Sec. Litig.*, 523 F. Supp. 533, 540 (S.D.N.Y. 1980) (auditors)), *aff'd sub nom., Bloor*, 754 F.2d 57.

the proceeds would move upstream to Parmalat and that the corrupt insiders were looting that entity, Rule 9(b) applies, as they allege in substance Deloitte USA's culpable participation in the insiders' fraud.[119]

As noted, Rule 9(b) requires a plaintiff to allege facts raising a strong inference of the defendant's knowledge. The inference may arise where the complaint sufficiently alleges that the defendant (1) benefitted in a concrete and personal way from the purported fraud, (2) engaged in deliberately illegal behavior, (3) knew facts or had access to information suggesting that fraud was being committed, or (4) failed to check information it had a duty to monitor.[120]

The complaints contain no allegations that Deloitte USA stood to receive any benefit from the Parmalat fraud. Rather, they allege that Deloitte USA engaged in deliberately fraudulent behavior by overstating Farmland's assets in its appraisal report, and that it improperly failed to investigate numerous "red flags" indicating that something was amiss at Parmalat. In other words, plaintiffs do not claim that Deloitte USA had motive and opportunity to perpetuate the Parmalat fraud, but that it consciously or recklessly misbehaved.

---

[119]

*Cf. First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 770-772 (2d Cir. 1994) (requiring party to allege loss causation with particularity where claims were premised on fraud).

[120]

*See Fraternity Fund*, 376 F. Supp. 2d at 404 (quoting *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000)).

### a.    Fraudulent Appraisal

Plaintiffs argue that Deloitte USA's fraudulent intent can be inferred from the fact that it ignored certain valuation methods and relied on projected instead of actual earnings to arrive at an appraisal value of Farmland's assets that inexplicably was seven times greater than the value reported by DHAC four years earlier. They contend also that the inference is strengthened by the fact that Deloitte USA improperly served as both Parmalat USA's auditor and the appraiser for the sale-leaseback transaction. The argument has superficial appeal. But greater scrutiny reveals that it is not as strong as it appears at first blush.

### (1)    DHAC's 1999 Appraisal

First, it simply is not the case that Deloitte USA failed to explain why it reported a higher value than DHAC. Unlike DHAC's appraisal, which considered only Farmland's property in Wallington, New Jersey,[121] Deloitte USA's appraisal considered this property as well as property in Atlanta, Brooklyn, Grand Rapids, and Decatur, Alabama.[122] In addition, Deloitte USA's appraisal report explained that there had been a "major investment" in the Wallington facility in "the past few years" and that other equipment had been installed there "recently."[123]

---

121

See Toscano Decl. Ex. C [hereinafter, "DHAC Appraisal Report"] at 1, 4-5, 18-22.

122

See id. Ex. B [hereinafter, "Deloitte USA Appraisal Report"] at 13-18, cover letter.

123

Id. at 14.

Plaintiffs relied on both the DHAC and Deloitte USA appraisal reports in making their allegations. See, e.g., Pappas SAC ¶ 243. The Court therefore may consider these documents at the pleadings stage. E.g., Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002). It may do so, however, only to conclude that certain statements were

This of course does not establish, nor may the Court conclude on a motion to dismiss, that Deloitte USA provided accurate appraisal values in its report. But it substantially undercuts any inference of Deloitte USA's fraudulent intent based on the fact that its appraisal values were higher than DHAC's.

## *(2)   Valuation Approaches*

Second, contrary to plaintiffs' allegations, Deloitte USA's appraisal report did not "ignore" the cost and market comparable approaches to valuation.[124] Rather, it considered these approaches, but concluded that the discounted cash flow approach was the most appropriate for valuing Farmland's assets.[125] It stated in the report that the cost approach was not viable because there was a dearth of information "regarding the composition of the components" of Farmland's

---

made therein, not to assess the truth of the matters asserted. *E.g., Loveman v. Lauder*, 484 F. Supp. 2d 259, 268 n.48 (S.D.N.Y. 2007).

124

According to Deloitte USA's appraisal report, the cost approach "considers the value of facilities in terms of the investment in current labor and materials required to assemble facilities possessing comparable utility to the facilities subject to the appraisal." The market comparable approach "is based upon the observation of actual market transactions between buyers and sellers to establish a value . . . through the identification of market transactions involving similar assets." The discounted cash flow approach "measures the present worth of the expected future economic benefits in the form of cash flows associated with asset ownership." Deloitte USA Appraisal Report 21-22.

To put it more colloquially, the cost approach establishes how much it would cost to replace a piece of property, the market comparable approach establishes how much a potential purchaser would pay for the property, and the discounted cash flow approach establishes the present value of future income expected to be generated by the property.

125

*Id.* at 25-42.

property.[126] Moreover, it stated that the market comparable approach was disadvantageous because comparisons to similar properties – the backbone of that approach – necessarily are imperfect. Deloitte USA nevertheless provided a valuation based on the market comparable approach and indicated that it "considered the indication of value from this approach in assessing the reasonableness of the indication of value from [its] primary approach, the discounted cash flow approach."[127]

Plaintiffs do not explain why this was improper. Indeed, DHAC's appraisal report – which plaintiffs assume was accurate – also considered various approaches before concluding that one approach was appropriate for valuing certain properties while other approaches were more useful for valuing other properties.[128] Plaintiffs fail also to explain how or why using other valuation methods besides the discounted cash flow approach would have produced better or more accurate appraisal values. Accordingly, allegations that Deloitte USA ignored certain valuation methods do not raise a strong inference of fraudulent intent.

### (3)    "Calculated" EBITDA Values

Third, the allegations that Deloitte USA improperly used "calculated" EBITDA values for the years 2001 and 2002 in employing the discounted cash flow approach are belied by Deloitte USA's appraisal report.

---

126

Id. at 25.

127

Id. at 31

128

See DHAC Appraisal Report 54-55.

According to the report, Deloitte USA projected 2003 EBITDA values and then reduced them by 2.5 percent per year to arrive at 2001 and 2002 values in employing the market comparable approach, not the discounted cash flow approach. The report states that this was done in order to make Farmland's EBITDA values consistent with those of "guideline companies" to which Farmland was compared for purposes of the market comparable approach, and for which actual 2002 EBITDA values were unavailable.[129] But as noted, Deloitte USA stated in the appraisal report that the market comparable approach was not as appropriate for valuing Farmland's assets as the discounted cash flow approach. In employing the discounted cash flow approach, the report stated, Deloitte USA used historical revenue and other information for 2001 and 2002. It did not "calculate" EBITDA values the way it did for purposes of the market comparable approach. In fact, the report does not state that Deloitte USA considered EBITDA values, "calculated" or otherwise, in applying the discounted cash flow approach.[130]

In light of this, the complaints must be interpreted as alleging that Deloitte USA's statements about the data it used for purposes of employing the discounted cash flow approach were false. But the complaints allege no facts raising an inference, let alone a strong inference, that this was the case. A bald allegation that Deloitte USA said one thing and did another is too conclusory to satisfy Rule 9(b).

---

[129]

Deloitte USA Appraisal Report 30.

[130]

*Id.* at 31-41.

### (4) Failure to Maintain Independence

Finally, an auditor's violation of an ethical duty of independence by itself does not

give rise to a strong inference of fraud. It may bolster other facts that tend to demonstrate fraud.[131]

Generally, however, an auditor's decision to take on non-audit work that threatens to compromise

its duty of independence gives rise to a strong inference of culpable intent only when it is shown that

the auditor had a "direct stake" in the alleged fraud.[132]

Plaintiffs do not allege that Deloitte USA stood to benefit from aiding the Parmalat

fraud or that it had anything to gain from appraising Farmland's assets other than ordinary appraisal

fees. The mere expectation of ordinary fees is not a sufficient motive to raise a strong inference of

culpable intent.[133]

Moreover, it is of more than passing interest that it was CGM – an entity that is not

alleged to have had anything to do with the Parmalat fraud – that "requested" that Deloitte USA

---

[131]

See, e.g., In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 215 (1st Cir. 2005) (Leval, J., sitting by designation) (allegations that auditor had motivation to overlook client's concealment of losses in order to maintain lucrative accounting business may bolster inference of *scienter*, but not enough by itself to give rise to strong inference).

[132]

See In re Royal Ahold N.V. Sec. & ERISA Litig., 351 F. Supp. 2d 334, 390-91 (D. Md. 2004) (citing In re MicroStrategy Inc. Sec. Litig., 115 F. Supp. 2d 620, 635-637 (E.D. Va. 2000) (strong inference of fraudulent intent raised where auditor had direct stake in maintaining false appearance of client company's financial health because it agreed to sell company products governed by contract that required long-term commitment from the company, and therefore made it less likely that purchasers would enter into contracts unless there was "clear assurance of the Company's financial health")).

[133]

See, e.g., In re Oxford Health Plans, Inc. Sec. Litig., 51 F. Supp. 2d 290, 294 (S.D.N.Y. 1999) ("generalized economic interests" such as "receipt of compensation and the maintenance of a profitable professional business relationship" does not give rise to strong inference of *scienter* (citing cases)); accord Stone & Webster, 414 F.3d at 215 ("[A]bsent truly extraordinary circumstances, an auditor's motivation to continue a profitable business relationship is not sufficient by itself to support a strong inference of scienter.").

conduct the appraisal for GECC. Had Parmalat or some other allegedly culpable entity done so, this perhaps would have taken plaintiffs closer to raising the inference that Deloitte USA's supposed violation of its duty of independence was motivated by fraudulent intent. But that is not what the complaints allege.

Accordingly, none of plaintiffs' allegations of improper appraisal methods raises a strong inference of Deloitte USA's knowledge of the Parmalat fraud.

### b.    *Improper Auditing Practices*

Plaintiffs next contend that culpable knowledge can be inferred from Deloitte USA's allegedly improper audits of Parmalat USA.

Allegations that an auditor failed to follow GAAS or other auditing procedures do not alone support a claim of fraud.[134] "Only where such allegations are coupled with evidence of 'corresponding fraudulent intent,' might they be sufficient."[135] Accordingly, the issue is not whether plaintiffs have alleged GAAS violations, but whether they have alleged facts indicating that those violations were motivated by or indicative or products of fraudulent intent.

The complaints allege that Deloitte USA encountered obvious signs that something was amiss at Parmalat, but failed to investigate and blow the whistle. Plaintiffs therefore rely on a

---

[134]

*Novak*, 216 F.3d at 309 (citing *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999); *Chill v. General Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996).

[135]

*Id.* (quoting *Chill*, 101 F.3d at 270).

theory of recklessness to show fraudulent intent.[136] The Second Circuit defines reckless conduct as conduct that is "highly unreasonable" and represents "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."[137] "[A]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness."[138]

### (1)    Reimbursement Credits

Plaintiffs argue that it should have been obvious to Deloitte USA that something improper was going on at Parmalat because it knew that Parmalat's reimbursement credits were bogus. They contend that Deloitte USA knew this because it conducted a successor audit of Parmalat USA in 1999 and discovered that Parmalat USA had not collected on any of the credits it had received from 1995 to 1998. This is unavailing.

The complaints do not allege why Parmalat's failure to pay past credits within a few years necessarily or probably should have indicated that it never would pay them. They do not allege, for example, that Parmalat had promised to the pay reimbursement credits within a certain time

---

136

> Rule 9(b) can be satisfied by allegations of "conscious recklessness – i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence – or actual intent." *Id.* (quoting *Novak v. Kasaks*, 997 F. Supp. 425 (S.D.N.Y. 1998)) (quotations omitted).

137

> *Id.* (quoting *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 47 (2d Cir. 1978) (quoting *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir. 1977) (ellipsis in original))).

138

> *Id.* (quoting *Chill*, 101 F.3d at 269 (quoting *Goldman v. McMahan, Brafman, Morgan & Co.*, 706 F. Supp. 256, 259 (S.D.N.Y. 1989) (ellipsis in original))).

frame or that its consistent practice prior to 1995 had been to pay reimbursement credits more quickly. Accordingly, it cannot be said that Parmalat's failure to pay past reimbursement credits within a four-year span should have signaled to Deloitte USA that its credits were a sham altogether, let alone that Parmalat's insiders were engaged in a fraudulent scheme to loot the company.

Plaintiffs contend also that Deloitte USA should have known something was amiss at Parmalat when Deloitte Italy and Parmalat refused to provide it with "confirmation . . . of the calculations and nature . . . [and] accounting treatment" of the reimbursement credits.[139] If Parmalat and Deloitte Italy were evasive in providing information material to Parmalat USA's audit and Deloitte USA failed to follow up, this perhaps would go some way towards raising an inference of recklessness.[140] But plaintiffs' allegations nevertheless are insufficient.

The complaints do not explain what it means to receive "confirmation" of the "calculations and nature" of reimbursement credits, or what a response to a request for such "confirmation" would look like. The most reasonable interpretation the Court can supply, bearing in mind that it must construe the pleadings in the light most favorable to plaintiffs, is that Deloitte USA sought confirmation that Parmalat USA had booked the proper amount of credits and that it had accounted for them properly by booking them as reimbursement of expenses as opposed to a capital contribution from Parmalat. Plaintiffs do not explain, however, how Deloitte Italy's or

---

139

*Pappas* SAC ¶ 93.

140

*See, e.g., SEC. v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998) (pleadings sufficient where defendant allegedly included false statements in SEC filings despite "the obviously evasive and suspicious statements made to him" by the corporate officials upon whom he was relying for this information and despite outside counsel's recommendation that these statements not be included).

Parmalat's failure to answer these questions would have indicated to Deloitte USA that Parmalat

never would pay the reimbursement credits or that Parmalat's insiders were committing fraud.

Plaintiffs do not allege that Parmalat or Deloitte Italy failed to confirm that Parmalat

would pay the credits or that it had the financial means to do so. Had Parmalat or Deloitte Italy been

evasive in answering *these* questions, perhaps this would have made the fact that Parmalat was

concealing financial difficulties sufficiently obvious to Deloitte USA to support an inference of

conscious recklessness. But that is not what plaintiffs allege.

The allegations imply that Deloitte USA acted improperly in failing to ask these

questions. This, however, amounts at best to a claim that Deloitte USA violated auditing standards

or that it was negligent, perhaps even grossly so. But it does not raise the inference that Deloitte USA

recklessly disregarded a substantial possibility that Parmalat was being looted.[141]

### (2)   Going Concern Qualifications

The allegations regarding going concern qualifications fail to raise an inference of

---

141

> *Cf. Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1210-11 (11th Cir. 2001) (failure of
> subsidiary's auditor to investigate warning signs that parent might not be able to give
> subsidiary the capital infusion it needed to survive and therefore to issue going concern
> qualifications raised inference of gross negligence but not fraud).
>
> Plaintiffs contend also that Zucchinali of Deloitte Italy told Pickette of Deloitte USA in a
> January 18, 2000 email that the reimbursement credits were part of a program referred to
> as "loss absorptions," meaning they were "contributions – income for the receiving
> company – from other Parmalat companies to cover losses." *Pappas* SAC ¶ 97. While use
> of the phrases "loss absorption" and "to cover losses" perhaps was suspicious, Zucchinali's
> email reasonably can be read as an innocent explanation that the reimbursement credits
> were promises to pay Parmalat subsidiaries for losses sustained or expenses borne on behalf
> of the parent company. The fact that Pickette received the January 18 email therefore does
> not raise a strong inference that Deloitte USA knew the reimbursement credits were part
> of a fraudulent scheme.

48

culpable knowledge as well.

Plaintiffs allege that, in connection with Parmalat USA's audit for the years 1999 to

2001, Deloitte USA improperly relied on management representations instead of "actual audit

evidence" that Parmalat intended to provide continuing financial support to the Companies. But

GAAS, AU Section 333.02, provides that "representations from management are part of the

evidential matter the independent auditor" must obtain.[142] Moreover, AU Section 333.11 provides

that

> "if the independent auditor performs an audit of the financial statements of a
> subsidiary but does not audit those of the parent company, he or she may want to
> obtain representations from management of the parent company concerning matters
> that may affect the subsidiary, such as related-party transactions *or the parent
> company's intention to provide continuing financial support to the subsidiary.*"[143]

Plaintiffs claim that this does not get Deloitte USA off the hook because AU Section

333.02 permits an auditor to use management representations as a supplement to other audit

evidence, not as "a substitute for the application of those auditing procedures necessary to afford a

reasonable basis for an opinion regarding the financial statements under audit."[144] Plaintiffs fail to

allege, however, what else beside management representations would qualify as "actual audit

evidence" of Parmalat's future intent to continue supporting the Companies and therefore why

---

142

American Institute of Certified Public Accountants, Codification of Statements on Accounting Standards, AU § 333.02 [hereinafter, "AICPA"]. *See Pappas* SAC ¶ 75 (equating AICPA with GAAS).

Plaintiffs relied on this document in making their allegations. *See, e.g., id.* ¶¶ 75, 89-91. The Court therefore may consider it on these motions. *E.g., Chambers*, 282 F.3d at 152-53.

143

AICPA AU § 333.11 (emphasis added).

144

*Id.* AU § 333.02.

management representations alone were insufficient. In any event, even if there were some other audit evidence that Deloitte USA failed to obtain, plaintiffs' allegations would amount only to a claim that Deloitte USA violated GAAS, which is not enough to raise an inference of culpable knowledge.[145]

The only allegations that bring plaintiffs close to raising a sufficient inference of recklessness are the claims that Bigogno of Deloitte Italy refused to honor Potts' request for audit evidence in connection with Parmalat USA's 2002 audit. As noted, allegations that Deloitte Italy or Parmalat refused to provide necessary audit information to Deloitte USA may be sufficient to satisfy Rule 9(b). The Court need not decide the issue, however. Even assuming that the Bigogno-Potts exchange is sufficient to raise a strong inference of Deloitte USA's culpable knowledge, this would not help plaintiffs on the proximate cause issue.

The Bigogno-Potts exchange allegedly occurred on May 8, 2003. This, however, was after Deloitte USA's audits of Parmalat USA for the years 1999 to 2001 and its April 30, 2003 appraisal of Farmland's assets. The only alleged conduct of Deloitte USA that occurred after May 8, 2003, was its 2002 audit of Parmalat USA. But plaintiffs do not allege that GECC or any other party relied on audited financial statements for 2002 in deciding whether the sale-leaseback

---

145

> Plaintiffs point also to AU Section 333.14, which provides that "[i]f the auditor is precluded from performing procedures he or she considers necessary in the circumstances with respect to a matter that is material to the financial statements, even though management has given representations concerning the matter, there is a limitation on the scope of the audit, and the auditor should qualify his or her opinion or disclaim an opinion." *Id.* AU § 333.14. But plaintiffs do not allege that Deloitte USA was precluded from performing auditing procedures in connection with its audits for the years 1999 to 2001. Plaintiffs perhaps allege that Deloitte USA was precluded from performing auditing procedures in connection with its 2002 audit because of Bigogno's refusal to provide audit evidence to Potts. This allegation is addressed in the text.

transaction should go forward. They allege only that GECC required Parmalat USA's audited financial statements for the years 2000 and 2001, and that it received *unaudited* financial statements for 2002. Accordingly, it cannot be said that the Bigogno-Potts exchange made it reasonably foreseeable that Deloitte USA's actions, at the time they were taken, would lead to the looting of the proceeds of the sale-leaseback transaction.

### *(3)     Overstatement of Goodwill*

Finally, allegations that Deloitte USA failed to reveal that Parmalat USA's goodwill was overstated in financial statements fail to raise a strong inference of fraudulent intent.

According to plaintiffs, Parmalat USA reported that its goodwill was approximately $202 million at the end of fiscal year 2000 and $198 million at the end of fiscal year 2001. This constituted approximately half of Parmalat USA's total reported assets in those years. Plaintiffs do not explain, however, what is improper or misleading about these values. They simply claim that "the results of the underlying operations of Parmalat-USA and its subsidiaries did not justify" the reported values. In addition, they allege that even though Parmalat USA reduced the company's reported goodwill by $26.5 million in 2002, "this write-down was not sufficient."[146] Allegations that reported goodwill values were "unjustified" or that a reduction in values was "insufficient" are conclusions. They are not facts constituting strong circumstantial evidence of conscious misbehavior or recklessness.

Plaintiffs contend also that "Deloitte recklessly did not require that [the 2002 write-

---

146

*Pappas* SAC ¶¶ 130-131.

down of goodwill] flow through to the consolidated financial statements of Parmalat-SpA."[147] The vague reference to "Deloitte" fails to indicate that Deloitte USA, which audited only Parmalat USA and apparently had no direct connection to Parmalat, was responsible for ensuring that information "flow through" to Parmalat's financial statements. Indeed, plaintiffs state elsewhere in the pleadings that this was the responsibility of Deloitte Italy.[148] The allegation therefore fails to raise a strong inference of Deloitte USA's fraudulent intent.

### 2. *Imputed Knowledge*

The fact that plaintiffs have failed to allege conduct by Deloitte USA itself that would give rise to an inference of culpable knowledge is not the end of the story. The complaints allege that Deloitte Italy was involved intimately in the Parmalat fraud and that its knowledge of wrongdoing, if any, should be imputed to Deloitte USA.

### a. *Agency*

Plaintiffs' first theory is that Deloitte Italy was DTT's agent, and that DTT in turn was Deloitte USA's agent.[149] As will become clear, however, even assuming plaintiffs adequately have

---

147

    *Id.* ¶ 131.

148

    *Id.* ¶ 191.

149

    It is possible to interpret the complaints as alleging an *alter ego* theory, despite their express references to agency law. The difference is immaterial, however. At least one court has held that the test for determining the existence of an agency relationship is the same as the test for determining whether two related corporations, such as a parent and a subsidiary, are *alter egos. See Kashfi v. Phibro-Salomon, Inc.,* 628 F. Supp. 727, 735 (S.D.N.Y. 1986) (citing *Fidenas A.G. v. Honeywell, Inc.,* 501 F. Supp. 1029, 1037 (S.D.N.Y. 1980)). *But see*

alleged Deloitte Italy's knowledge of the Parmalat fraud and its agency relationship with DTT, they

have not alleged adequately that DTT was Deloitte USA's agent.

As the Court previously has explained,

> "An agency relationship exists under New York law when there is agreement
> between the principal and the agent that the agent will act for the principal and the
> principal retains a degree of control over the agent. The element of control often is
> deemed the essential characteristic of the principal-agent relationship. To bind a
> principal, an agent must have authority, whether apparent, actual or implied. Actual
> authority arises from a principal's direct manifestations to the agent. It may be
> express or implied, but in either case it exists only where the agent may reasonably
> infer from the words or conduct of the principal that the principal has consented to
> the agent's performance of a particular act."[150]

### (1)    Common Officers and Directors

Plaintiffs' allege first that eleven of twenty-six members of DTT's board of directors

were partners of Deloitte USA, and that DTT and Deloitte USA shared a chief executive officer and

a chief financial officer.[151] But the fact that two corporations share officers and directors does not

establish by itself that one corporation is the agent of the other. It is a "well established principle [of

corporate law] that directors and officers holding positions with a parent and its subsidiary can and

---

*Royal Indus. Ltd. v. Kraft Foods, Inc.*, 926 F. Supp. 407, 413 (S.D.N.Y. 1996) ("If . . . an
agency arrangement is alleged, then the plaintiff should not have to also allege domination
and intent to defraud for the claim to survive."). In any event, both tests requiring a showing
of control, *Parmalat*, 375 F. Supp. 2d at 290-292, which plaintiffs have failed adequately
to allege.

150

*Parmalat*, 375 F. Supp. 2d at 290 (citing authority) (citations and quotations omitted).

151

*Pappas* SAC ¶ 273.

do 'change hats' to represent the two corporations separately, despite their common ownership."[152]

"[C]ourts generally presume 'that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary.'"[153] Plaintiffs offer no allegations to overcome this presumption.[154]

Moreover, the overlap of DTT's management with that of Deloitte USA is equally consistent with the inference that DTT controlled Deloitte USA as it is with the inference that Deloitte USA controlled DTT. Indeed, plaintiffs allege that "DTT exercised authority and control over the various Deloitte member firms engaged in Parmalat audits."[155] Deloitte USA cannot be said to have controlled DTT if, as is alleged, DTT was in control of Deloitte USA.[156]

### *(2) Deloitte USA's Financial Support of other Deloitte Entities*

Plaintiffs next allege that Deloitte USA paid the salaries and benefits of ten to forty

---

152

> *United States v. Bestfoods*, 524 U.S. 51, 69-70 (1998) (quoting *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 779 (5th Cir. 1997) (alteration in original); citing *Fisser v. Int'l Bank*, 282 F.2d 231, 238 (2d Cir. 1960)).

153

> *Id.* (quoting P. BLUMBERG, LAW OF CORPORATE GROUPS: PROCEDURAL PROBLEMS IN THE LAW OF PARENT AND SUBSIDIARY CORPORATIONS § 1.02.1, p. 12 (1983); citing *United States v. Jon-T Chemicals, Inc.*, 768 F.2d 686, 691 (5th Cir. 1985), *cert. denied*, 475 U.S. 1014 (1986)).

154

> *See id.* (fact that parent and subsidiary shared officers and directors not enough to hold parent vicariously liable under Comprehensive Environmental Response, Compensation and Liability Act).

155

> *Pappas* SAC ¶ 266; *see also id.* ¶¶ 254-271 (alleging DTT's control over Deloitte firms).

156

> *In re Parmalat Sec. Litig*, 377 F. Supp. 2d 390, 406 (S.D.N.Y. 2005).

percent of DTT's employees, "financially subsidized Deloitte's global integration process for the less profitable member firms such as [Deloitte Italy]," and provided funding to pay for claims brought against Deloitte member firms when their liability insurance did not provide complete coverage.[157]

The fact that one corporation finances some of the operations of another does not necessarily establish an agency relationship. The provision of financing does not in every circumstance establish the ability to control the way the beneficiary corporation performs its work. And where it does – perhaps because the financing corporation can threaten to cut off future support – it does not necessarily entail the beneficiary's power to act on the financing corporation's behalf.[158] The allegations regarding Deloitte USA's role in the Deloitte organization suggest at most that Deloitte USA was a particularly profitable Deloitte member firm and that DTT – the umbrella entity allegedly capable of controlling the Deloitte member firms – therefore used the proceeds from Deloitte USA's operations to fund the operations of itself and certain other member firms. The allegations by themselves do not support the inference that Deloitte USA controlled the manner of DTT's performance, or that DTT acted on its behalf.

### (3)    Dispute Between Deloitte USA and Deloitte Italy

Finally, plaintiffs allege that when Mamoli of Deloitte Italy objected to the idea of Deloitte USA appraising Farmland's assets while simultaneously serving as Parmalat USA's auditor,

157

    *Pappas* SAC ¶¶ 273-275.

158

    *See Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.*, 909 F.2d 698, 702-03 (2d Cir. 1990) (no agency relationship established where one company provided financing to another, but beneficiary "was meant to, and did, operate independently").

Deloitte USA "secure[d] the intervention of" DTT's Horstmann to "persuade" Mamoli to withdraw his objection.[159] According to plaintiffs, this demonstrates that Deloitte USA controlled DTT.[160]

This is unavailing. Alleging that a company requested a representative of its parent organization to resolve its business dispute with a sister company is far from alleging that it controlled the parent organization. Plaintiffs do not allege, for example, that anyone at Deloitte USA ordered – or had the authority to order – Horstmann to intervene, let alone to resolve the dispute the way he did. Rather, they allege that it was Horstmann's job to resolve disputes between Deloitte member firms and that even though it was Deloitte USA that requested his help, Horstmann was acting on behalf of DTT when he intervened. Accordingly, apart from the conclusory and therefore insufficient allegation that Deloitte USA was "dominant over DTT," and "impose[d] its will" on Deloitte Italy,[161] plaintiffs do not allege anything about DTT's involvement in the dispute that would support the conclusion that Deloitte USA controlled DTT.

### b.    Joint Venture

Plaintiffs' second theory of imputed knowledge is that all of the Deloitte entities were engaged in a joint venture. Knowledge of a joint adventurer is imputed to its co-adventurers.[162]

"A joint venture is a special combination of two or more persons where in some

---

159

*Pappas* SAC ¶ 228-231.

160

*Id.* ¶ 276.

161

*Id.*

162

*See Mallis v. Bankers Trust Co.*, 717 F.2d 683, 689 n.9 (2d Cir. 1983) (citing cases).

specific venture a profit is jointly sought. The indicia of the existence of a joint venture are: (i) acts manifesting the intent of the parties to be associated as joint venturers; (ii) mutual contribution to the joint undertaking through a combination of property, financial resources, effort, skill or knowledge; (iii) a measure of joint proprietorship and control over the enterprise; and (iv) a provision for the sharing of profits and losses. The ultimate inquiry is whether the parties have so joined their property, interests, skills and risks that for the purpose of the particular adventure their respective contributions have become as one and the commingled property and interests of the parties have thereby been made subject to each of the associates on the trust and inducement that each would act for their joint benefit."[163]

Plaintiffs' theory essentially is that the Deloitte member firms were joint adventurers in auditing Parmalat's financial statements, as each provided auditing services under the Deloitte aegis to different Parmalat entities according to the same auditing standards and shared in the profits and fees generated by the Parmalat account.[164] The Court previously rejected just such a theory, holding that "allegations that several firms worked on specific Parmalat-related assets together and that they all followed the same auditing standards" did not give rise to an inference that the firms had

---

163

*Decker, Decker & Assocs., Inc. v. Ass'n of Nat'l Advertisers, Inc.*, No. 108398/06, 2007 WL 1053881, *5 (N.Y. Sup. Ct. N.Y. Co. April 10, 2007) (citing authority) (citations and quotations omitted).

Plaintiffs argue that New Jersey law differs from New York law in that it does not require a showing of intent to establish the existence of a joint venture. This is incorrect. *See, e.g.*, *Ginsberg v. Bistricer*, No. C-113-98 2007 WL 987169, *11 (N.J. Super. App. Div. Apr. 4, 2007) ("In determining whether a joint venture was formed, the court's primary consideration is the intention of the parties."); *Sullivan v. Jefferson, Jefferson & Vaida*, 167 N.J. Super. 282, 290, 400 A.2d 836, 840 (N.J.Super. App. Div. 1979) ("[T]he basic criterion of a joint venture . . . [is] the voluntary agreement of the parties to form a relationship with the intent to create a joint venture."). In any event, as will become clear, plaintiffs have failed to allege the joint control element of a joint venture. The intent of the Deloitte entities therefore is beside the point.

164

*See Pappas* SAC ¶¶ 284-303.

mutual control over each other and the purported enterprise.[165] In other words, it failed to indicate that each firm's individual work on a particular Parmalat project had "become as one" with the work of its sister firms.

Plaintiffs attempt to distinguish this case by arguing that the alleged joint venture here was not the *auditing* of Parmalat, but the *certification* of its financial statements.[166] They claim that each member firm had the ability to withhold certification of a Parmalat subsidiary's financial statements, and therefore the *de facto* power to ensure that Parmalat's consolidated financial statements did not receive certification or an unqualified opinion.

This is unavailing. One of the essential features of a joint venture is an agreement among the parties to share profits and losses from the undertaking. The Deloitte firms, however, presumably did not earn profits or suffer losses in connection with their certification of Parmalat's financial statements, but in connection with their provision of auditing services to various Parmalat entities. That is, they presumably received payment regardless of whether they issued certifications or qualified their audit reports. Plaintiffs allege no facts to rebut this presumption.[167] Hence, it cannot be said that the Deloitte entities engaged in a joint venture, the sole object of which was to ensure that Parmalat's consolidated financial statements were certified.

Plaintiffs claim also that there was joint control in this case because each member

---

165

  *Parmalat*, 421 F. Supp. 2d at 717-18 (applying Illinois law and quoting *Parmalat*, 377 F. Supp. 2d 390, 407).

166

  *See Pappas* SAC ¶ 280.

167

  *See id.* ¶ 288 (alleging that Deloitte firms shared in the "profits and losses in their overall *audits*" (emphasis added)).

firm "had the power to, and did, control the nature, amount, and flow of information to other Deloitte member firms regarding the Parmalat entity, subsidiary, or affiliate under audit."[168] But this cuts the other way. It suggests that the firms did *not* have control over one another's work, but instead acted as individual entities working on discrete projects. If there were a free flow of information and each firm had unfettered access to information concerning a sister firm's project, then perhaps one could infer that the work of all the Deloitte firms had "become as one." The complaints, however, allege the opposite.

\*     \*     \*

In the last analysis, the Court is not persuaded that plaintiffs have alleged that DTT was Deloitte USA's agent, or that the Deloitte member firms were engaged in a joint venture. Any knowledge Deloitte Italy and DTT might have had of the Parmalat fraud therefore cannot be imputed to Deloitte USA.[169]

As plaintiffs have failed adequately to allege Deloitte USA's knowledge that Parmalat's insiders were committing fraud, they have failed to allege that it was reasonably foreseeable to Deloitte USA that its conduct eventually would result in the looting of Farmland's assets. Contrary to plaintiffs' assertions, this case is indistinguishable from *Bloor*. Plaintiffs allege at most that Deloitte USA caused the sale-leaseback transaction to occur. But they do not allege

---

168

> *Id.* ¶ 300.

169

> As noted, plaintiffs' allegations arguably are more consistent with the conclusion that Deloitte USA was DTT's agent, rather than *vice versa*. This does not help plaintiffs, however, "as an agent generally is not liable for the acts of co-agents." *In re Parmalat Sec. Litig.*, 421 F. Supp. 2d 703, 707 (S.D.N.Y. 2006).

59

adequately that Deloitte USA proximately caused the proceeds of that transaction to be looted. Accordingly, plaintiffs have failed to plead proximate cause for purposes of their claims against Deloitte USA.

## *Conclusion*

The motions of Deloitte USA, DTT, Deloitte Italy, GTI, GT USA, the Bank of America Defendants, the Credit Suisse Defendants, and BNL to dismiss the second amended complaints of Smith[170] and Pappas[171] are granted in their entirety. The motion of Banca Intesa to dismiss Smith's second amended complaint[172] is granted in its entirety as well.

SO ORDERED.

Dated:      August 8, 2007

Lewis A. Kaplan
United States District Judge

---

[170]

04 MD 1653 docket items 703, 686, 689, 696, 695, 702, 713, 693; 06 Civ. 0383 docket items 185, 168, 171, 176, 175, 182, 195, 174.

[171]

04 MD 1653 docket items 721, 1276, 722, 734, 733, 743, 727, 738; 06 Civ. 3109 docket items 9, 10, 13, 27, 25, 39, 20, 32.

[172]

04 MD 1653 docket item 709; 06 Civ. 0383 docket item 189.